UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
ALLSTATE INS. CO., et al.,

                                        Plaintiff,

                                                          Case No.
                - against -                               1:16-cv-01465(AMD)(VMS)

                                                          <u>**Answer and Counterclaim**</u>

DMETREI ABRAMOV, et al.,

                                        Defendants.
----------------------------------------------------------------------X

Defendants Uriyel Mirzakandov, and MDAX, Inc., answer the Plaintiffs' Complaint as follows;

1.      Deny each and every allegation against or involving Uriyel Mirzakandov, and MDAX, Inc., in paragraphs designated 1-22, 24, 37-44, 46-48, 109, 131, 170-303, 868-81, 883-91, 893-95, 897-903, and 1623-29.

2.      Deny knowledge and information sufficient as to form a belief as to the allegations contained in paragraphs designated 49-74, 76-108, 110-30, 132-55, 163-68, 305-318, 320-28, 330-32, 334-40, 342-55, 357-70, 372-80, 382-84, 386-92, 394-407, 409-17, 419-21, 423-29, 431-44, 446-54, 456-66, 468-81, 483-91, 493-95, 497-503, 505-18, 520-28, 530-32, 534-40, 542-55, 557-65,567-569, 571-577, 579-92, 594-602, 604-06, 608-14, 616-29, 631-39, 641-43, 645-51, 653-66, 668-81, 683-91, 693-95, 697-703, 705-18, 720-33, 735-43, 745-47, 749-55, 757-70, 772-80, 782-92, 794-807, 809-17, 819-21, 823-29, 831-44, 846-54, 856-58, 860-66, 905-18, 920-33, 935-43, 945-47, 949-55, 957-70, 972-80, 982-84, 956-92, 994-1007, 1009-17, 1019-29, 1031-44, 1046-54, 1056-58, 1060-66, 1068-81, 1083-91, 1093-95, 1097-1103, 1105-18, 1120-28, 1130-32, 1134-40, 1142-55, 1157-65, 1167-69, 1171-1177, 1179-92, 1194-1202, 1204-06, 1208-14, 1216-29, 1231-39, 1241-43, 1245-51, 1253-66, 1268-76, 1278-80, 1282-88, 1290-1303, 1305-13, 1315-17, 1319-25, 1327-40, 1342-50, 1352-54, 1356-62, 1364-77, 1379-87, 1389-91, 1393-99, 1401-14, 1416-24, 1426-28, 1430-36, 1438-51, 1453-61, 1463-65, 1467-73, 1475-88, 1490-98, 1500-02, 1504-10, 1512-25, 1527-35, 1537-39, 1541-47, 1549-62, 1564-72, 1574-76, 1586-99, 1601-09, 1611-13, 1615-21, and 1578-84.

3.      Deny any knowledge sufficient to form a belief as to each and every allegation contained in the paragraphs designated as 23, 25-36, 45, 156-62, and 169, as said allegations are conclusions of law, and such questions are respectfully referred to the Court.

4.      Reiterate respective responses set forth herein as to the allegations contained by incorporation in paragraphs designated as 304, 319, 329, 333, 341, 356, 371, 381, 385, 393, 408, 418, 422, 430, 445, 455, 467, 482, 492, 496, 504, 519, 529, 533, 541, 556, 566, 570, 578, 593, 781,  603, 607, 615, 630, 640, 644, 652, 667, 682, 692, 696, 704, 719, 734, 744, 748, 756, 771, 793, 808, 818, 822, 830, 845, 855, 859, 867, 882, 892, 896, 904, 919, 934, 944, 948, 956, 971, 981, 985, 993, 1008, 1018, 1030, 1045, 1055, 1059, 1067, 1082, 1092, 1096, 1104, 1119, 1129, 1133, 1141, 1156, 1166, 1170, 1178, 1193, 1203, 1207, 1215, 1230, 1240, 1244, 1252, 1267, 1277, 1281, 1289, 1304, 1314, 1318, 1326, 1341, 1351, 1355, 1363, 1378, 1388, 1392, 1400, 1415, 1425, 1429, 1437, 1452, 1462, 1466, 1474, 1489, 1499, 1503, 1511, 1526, 1536, 1540, 1548, 1563, 1573, 1577, 1585, 1600, 1610, 1614, and 1622.

5.      Admit the facts averred by Plaintiffs, while denying any allegations of fraud, deception, money laundering, submission of allegedly fraudulent claims to any Plaintiff, or any other illegal act or wrongdoing, expressed or implied, in the paragraph designated as 75.

Furthermore, Answering Defendants asserts the following **DEFENSES**:

**One.**       Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

**Two.**       Plaintiffs failed to join parties required by Federal Rule of Civil Procedure 19.

**Three.**     Plaintiffs' causes of action are barred, in whole or in part, by the doctrine of *res judicata*, claim preclusion.

**Four.**      Plaintiffs' claims are barred, in part, by the doctrine of collateral estoppel, issue preclusion.

**Five.**      Plaintiffs' recovery is barred, in whole or in part, by their failure to mitigate damages.

**Six.**       Plaintiffs' alleged losses, liabilities, or other expenses, if any, were not directly or proximately caused by the conduct of the Defendant as alleged or otherwise.

2

**Seven.**       Plaintiffs' injury, if any, was the result of the intervening or superseding conduct of third parties.

**Eight.**       Plaintiffs have failed to disclose a concrete financial loss, and thus Plaintiffs' injury, if any, is not compensable. Plaintiffs' recovery of damages is barred in whole or in part because Plaintiffs' alleged damages are speculative.

**Nine.**       Plaintiffs' damages were caused, in whole or in part, by Plaintiffs' own negligence and/or the negligence of a third party.

**Ten.**       Plaintiffs waived any and all claims they might have against Defendant.

**Eleven.**       Plaintiffs' recovery is barred by the defense of release.

**Twelve.**       Plaintiffs' claims are barred, in whole or in part, because Plaintiffs would be unjustly enriched if they were allowed to recover the damages alleged in the Complaint.

**Thirteen.**       Defendants did not act with the requisite scienter for actionable fraud.

**Fourteen.**       Plaintiff did not rely on the statements and/or conduct of Defendant, and if it did, such reliance was not justifiable.  And if the reliance was justifiable, it was not to the detriment of Plaintiffs.

**Fifteen.**       Any and all actions taken by Defendants with respect to any of the matters alleged in the Amended Complaint were taken in good faith and in accordance with established industry practice.

**Sixteen.**       Plaintiffs' claims are barred by the equitable doctrines of laches.

**Seventeen.**       Plaintiffs' remedies are limited to those provided by Article 51 of the New York State Insurance Law.

**Eighteen.**       The United States Court for the Eastern District of New York lacks jurisdiction over Plaintiffs' claims.

**Nineteen.**       Plaintiffs' claims are subject to arbitration pursuant to No-Fault law and the Federal Arbitration Act.

**Twenty.**       Plaintiffs' claims, in whole or in part, are barred by the doctrine of arbitration and award.

**Twenty-one.**   Plaintiffs' claims are barred by the doctrine of accord and satisfaction.

**Twenty-two.**    Plaintiffs fail to state a claim upon which relief can be granted.

6.      Defendants Answering herein also incorporates by reference, reiterates, and preserves any and all defenses put forth by co-Defendants in their respective Answers.

7.      Defendants Answering herein have not knowingly or voluntarily waived any applicable defenses, affirmative or otherwise, and reserves the right to assert and rely upon additional defenses as such arise, or become available or apparent as Discovery progresses, during the course of this litigation.

8.      Defendants answering herein assert that they currently lack any knowledge of any fraudulent or otherwise unlawful acts committed by any associate, employee, patient or agent of any Defendant. In the event such acts are discovered by Answering Defendants, Defendants Answering herein reserve their right to assert claims against such parties to indemnify Answering Defendants against such parties' unlawful or fraudulent actions,  as such arise, or become available or apparent as Discovery progresses, during the course of this litigation.

9.       Defendants herein further deny any each and every allegation not heretofore controverted, and demand strict proof thereof, including any paragraphs not designated above and any unnumbered paragraphs in the Complaint containing allegations against Defendants herein.

## <u>COUNTERCLAIM</u>

Counterclaim Plaintiffs Uriyel Mirzakandov ("Mirzakandov") and MDAX, Inc. ("MDAX" and "Counterclaim Plaintiffs," "Counterclaim Suppliers" or "Equipment Suppliers" collectively), by undersigned counsel, hereby submit their Counterclaim against Defendants Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company, and Allstate Fire & Casualty Insurance Company ("Defendants" or "Allstate").[1]

---

[1] This Counterclaim is brought pursuant to Fed. R. Civ. P. 13.  The underlying RICO complaint (Doc. 1, filed on March 25, 2016, and the amended complaint, Doc. 5, filed on May 9, 2016, hereafter "underlying RICO Complaint") was brought against many defendants, but this Counterclaim is only brought by Uriyel Mirzakandov and MDAX, Inc.

**Parties, Jurisdiction & Venue**

1. Plaintiff Uriyel Mirzakandov is a citizen of New York.  He is the president and owner of Plaintiff MDAX.

2. Plaintiff MDAX, Inc. is a New York corporation (incorporated on or about March 4, 2015) authorized to do business in New York, with its principal place of business in Middle Village, New York.  MDAX, Inc. is a company that sells durable medical equipment ("DME"), such as back and knee braces.

3. Defendants Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company, and Allstate Fire & Casualty Insurance Company are corporations incorporated in Illinois and authorized/licensed to conduct business and to issue automobile insurance policies in New York.

4. The Court has jurisdiction of the case as a federal question arising under RICO's civil remedies provision, 18 U.S.C. §1964(c) and 28 U.S.C. §1331 (federal question jurisdiction).

5. Venue is proper in this district because the RICO violations occurred here and the parties reside here.

**Introduction**

6. Allstate's underlying RICO Complaint alleges that the Counterclaim Suppliers committed mail fraud in connection with insurance claims they submitted for repayment of DMEs supplied to victims of automobile accidents.  These are bills submitted by the Suppliers to Allstate pursuant to 12 NYCRR §442.2, which incorporates the Medicaid fee schedule for the reimbursement of DME bills.

7. Allstate believes that the Counterclaim Suppliers are making too large of a profit on fee schedule DMEs because of the difference in wholesale price versus the fee schedule price. Allstate, therefore, refuses to reimburse the Counterclaim Suppliers for these fee schedule DMEs unless the Counterclaim Suppliers provide Allstate with the wholesale cost of such items.  Allstate has no legal right to obtain such information from the Counterclaim Suppliers, but wants this information to use in its attempt to force the Counterclaim Suppliers to accept reimbursement at cost.

8. There is no legitimate reason Allstate should have this information, which merely establishes the Counterclaim Suppliers' profit on the DME transaction, not the authenticity of the DME supplied. (This is hereafter referred to as "the Scheme").

9. In short, pursuant to the Scheme, Allstate is using the threat of complete nonpayment/non-reimbursement (on pending bills) to extort the Counterclaim Suppliers into accepting reimbursement at cost, thus saving Allstate the profit spread that the Counterclaim Suppliers would otherwise earn on such transactions.

## How The Scheme Operates:

10. The Counterclaim Suppliers are retail suppliers who purchase DMEs from wholesale suppliers as part of New York's no fault automobile insurance law. The Counterclaim Suppliers provide DMEs to victims of automobile accidents and then submit the bills to Allstate for reimbursement.

11. Pursuant to 12 NYCRR 442.2, the reimbursement rates for these DMEs are subject to a predetermined and fixed fee schedule:

> The maximum permissible charge for the purchase of durable medical equipment [DME], medical/surgical supplies, and orthotic and prosthetic appliances shall be the fee payable for such equipment or supplies under the New York State

Medicaid program at the time such equipment and supplies are provided… (12 NYCRR §442.2(a)).

12. Upon receiving the Counterclaim Suppliers' bills, Allstate is required by the New York No-Fault insurance law to assert any basis for non-payment to each claim or bill received within 30 days in writing, including that the device was not provided, that the device was not medically necessary, and/or that the cost of the device exceeded the maximum allowed amount, or request additional information within this same time-frame.

13. If an insurer (such as Allstate) wants additional information for a bill or claim, pursuant to 11 NYCRR 65-3 (Regulation 68-C), upon receipt of the claim for reimbursement for any medical device, Allstate has statutory rights and obligations to request and receive all necessary documentation and information, including but not limited to, conducting Examinations Under Oath ("EUO") and/or Independent Medical Examinations ("IME"), in order to verify the claims.

14. Thus, if an insurer suspects fraud and/or disputes the validity, efficacy, and/or medical necessity of the services/products billed for, the No-Fault law and regulations allow Allstate to conduct an investigation and review of the full medical records and billing files.

15. As part of this verification process, however, Allstate has no basis for obtaining or requesting the cost paid by the Counterclaim Suppliers to the wholesale companies.   Pursuant to 12 NYCRR §442.2(a), for fee schedule reimbursement, the cost paid by the Counterclaim Suppliers is only relevant for "orthopedic footwear or if the New York State Medicaid program has not established a fee payable for the specific item." *Id.* In such situations, §442.2(a) prescribes that the reimbursement rate is the lesser of either the acquisition cost plus 50% or the usual/customary price charged to the public.   *Id.*   The Counterclaim

Suppliers, however, are not providing orthopedic footwear and the DME billed by the Counterclaim Suppliers are covered by the §442.2(a) fee schedule.

16. Accordingly, if the Counterclaim Suppliers submit proof that they have actually supplied a particular type/quantity of DME to a patient on a particular date, Allstate is obligated to pay the Suppliers' bill(s). The amount that the Counterclaim Suppliers may (or may not) have paid a wholesaler for that particular DME has no bearing on this process. As the New York courts have held, the no-fault law is designed to obtain prompt payment of medical claims without "red-tape dilatory practices." *Fair Price Med. Supply Corp. v. Travelers Indemnity Co.*, 10 N.Y. 3d 556, 565 (N.Y. 2008).

17. But Allstate still wants this wholesale DME information because it believes the fee schedule for the DME billed by the Counterclaim Suppliers is too generous, and therefore, the Counterclaim Suppliers' profits are too high. And Allstate does not want to pay this profit spread, but instead limit reimbursement to the Counterclaim Suppliers' cost.

18. If Allstate is successful with its Scheme, it will directly cause the Counterclaim Suppliers to receive lower amounts of reimbursement, resulting in more money that Allstate can keep for itself.

19. As part of the Scheme, Allstate initially paid out approximately $18,000 to the Counterclaim Suppliers for billed fee schedule DME, a relatively modest amount.[2]

20. But once the Counterclaim Suppliers' DME fee schedule bills reach an aggregate amount, Allstate begins to request wholesale cost information so that it can limit (or attempt to limit) all future payments strictly to cost.

---

[2] This $18,000 amount represents approximately 30 transactions that Allstate is suing Mirzakandov and MDAX for in the underlying RICO complaint.

21. To further this scheme, Allstate refuses payment of all outstanding and future DME fee schedule bills, contending that reimbursement will not occur until the Counterclaim Suppliers submit the wholesale acquisition cost of the DME.

22. Allstate has sent over 500 such letters to Counterclaim Suppliers since November 2015 (if not earlier) and is continuing to send out such letters on pending bills.

23. Allstate uses the increasing amount of unpaid bills (and the continued threat of total nonpayment) as the threat to force the Counterclaim Suppliers to turn over this wholesale information, which it will use force them to accept reduced future payments.

24. In response, the Counterclaim Suppliers submit any additional information requested by Allstate, *except* the amount it paid the wholesale sellers for the DME (*i.e.*, the acquisition cost).  Accordingly, the Counterclaim Suppliers do not submit any cancelled checks to Allstate, and when they submit the wholesale invoices to Allstate, the amount paid is redacted.

25. The Counterclaim Suppliers do not provide this information because they are not required to by the New York no-fault regulations.  And even if Allstate suspects fraud, the wholesale price that the Counterclaim Suppliers paid for fee schedule DME will not produce any evidence regarding whether a particular type of DME was actually supplied or not.

26. Indeed, N.Y. Insurance Law §5108 requires that "[e]very insurer shall report to the commissioner of health any patterns of overcharging, excessive treatment or other improper actions by a health provider within thirty days after such insurer has knowledge of such pattern."  Though Allstate contends in the underlying RICO case that the Counterclaim Suppliers committed fraud with respect to approximately 30 submitted bills, at no time has

Allstate ever reported such alleged fraud to the commissioner of health, in accordance with this section.

27. In response to Counterclaim Suppliers' redaction of the wholesale acquisition cost/withholding cancelled checks, Allstate denied/refused reimbursement for over $300,000 worth of claims, a relatively large amount of unpaid bills for a small medical business, like MDAX.

28. Allstate knows that MDAX is a small medical business that cannot afford to have short-term unpaid bills (exceeding $300,000) from Allstate, one of the largest no-fault insurance companies in New York.

29. And these two Counterclaim Plaintiffs are not alone.  Allstate has carried out this same Scheme against dozens of others equipment suppliers who were also named as defendants in the underlying RICO case.

30. Allstate's Scheme has been ongoing for the past year and will not halt without judicial intervention.

31. Accordingly, as detailed below, the Counterclaim Suppliers seek their attorney's fees and over $300,000 in unpaid bills.

**The Scheme Violates The Hobbs Act**

32. The preceding paragraphs are incorporated herein as though fully set forth below.

33. The Hobbs Act makes it a federal crime to obtain property through fear, force or violence or for anyone who attempts/conspires so to do:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion *or attempts or conspires so to do*, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.   18 U.S.C.

§1951(a) (emphasis added).

34. Allstate's Scheme is an attempt and a conspiracy to extort the Counterclaim Suppliers out of future profit(s) by using the threat of nonpayment on over $300,000 worth of unpaid bills.

35. Allstate has no legal basis to deny reimbursement for §442.2 fee schedule DME based upon failure to submit wholesale cost information.   But Allstate threatens nonpayment/non-reimbursement of the Counterclaim Suppliers' fee schedule DME bills unless wholesale cost information is submitted.   Allstate is seeking this wholesale information to reduce/limit future payments/reimbursements to the Counterclaims Suppliers.

36. Allstate's goal is to lower/reduce the DME fee schedule so that all future reimbursements are at a lower/reduced rate (*i.e.,* at cost), thereby cutting into the Counterclaim Suppliers' future profits and allowing Allstate to retain a larger share of the money it makes on New York no-fault insurance premiums.

37. Allstate believes that the Counterclaim Suppliers, as small businesses who need payment and liquidity in the short-run, would have no choice but capitulate to this threat.

38. The Counterclaim Suppliers have, thus far, withstood this threat.  But although Allstate has not yet succeeded in obtaining this wholesale information from the Counterclaim Suppliers, its attempts to do so has caused the Counterclaim Suppliers to incur substantial legal fees and to have over $300,000 in unpaid bills for §442.2 DME reimbursements withheld by Allstate.

39. Allstate has carried out this Scheme against the Counterclaim Suppliers since at least November 2015.  The Scheme is ongoing as Allstate continues to refuse to pay the over $300,000 remaining until the Counterclaim Suppliers submit the wholesale cost information.

40. Allstate has also carried out this same Scheme against dozens of other suppliers in New York City (*i.e.*, the defendants in the underlying RICO case) over the past year.

41. The Scheme affects interstate commerce because it negatively impacts the suppliers' businesses resulting in fewer transactions with out-of-state companies that sell supplies to such medical practices.

42. Accordingly, the Scheme violates 18 U.S.C. §1951, an act of racketeering pursuant to 18 U.S.C. §1961. And extortion is one of the classic forms of "racketeering activity."

**The Scheme Also Violates 18 U.S.C. §1832 (Theft Of Trade Secrets)**

43. The preceding paragraphs are incorporated herein as though fully set forth below.

44. The Counterclaim Suppliers vigorously negotiate the wholesale cost/prices for fee schedule DME with each wholesale supplier.  The negotiations are ongoing and changing and depend upon many factors, including their business history, present demand, and future demand.

45. This information is not publicly available and is known only to the Counterclaim Suppliers and the individual wholesaler.

46. This information is integral to the success of the Counterclaim Suppliers' business because, as a retail supplier, their profit is based primarily upon the difference between the wholesale price and the established DME fee schedule.

47. The Counterclaim Suppliers keep this wholesale price information a secret from their competitors. If a competitor learns the amount that the Counterclaims Suppliers pay for wholesale DME, the competitors can use this information to buy out the wholesaler's remaining DME supply at that price.  It can then take the wholesaler three to four months to restock their supply of such DME, leaving the Counterclaim Suppliers with no DME to resell during this period.

48. Due to the very sensitive nature of the wholesale price, the Counterclaim Suppliers closely guard this information.  MDAX has four to five employees, but only Uriyel Mirzakandov has

access to this wholesale price information.  The price information is kept in only one binder

in Mr. Mirzakandov's office and the office is locked.

49. Accordingly, the Counterclaim Suppliers' wholesale DME cost information is a trade secret.

50. 18 U.S.C. §1832 makes it a federal crime to appropriate/obtain trade secrets without

authorization, or to attempt or conspire to do so:

> Whoever, with intent to convert a trade secret, that is related to a product
> or service used in or intended for use in interstate…commerce…to the
> economic benefit of anyone other than the owner thereof, and intending or
> knowing that the offense will, injure any owner of that trade secret,
> knowingly… without authorization appropriates, takes… [or] obtains such
> information; [or] attempts to…[or] conspires with one or more other
> persons to…[to do so]…shall…be fined…or imprisoned not more than 10
> years…  §1832(a)(1), (4), (5).

51. Allstate's Scheme is an attempt and conspiracy to appropriate, take, and/or obtain, without

authorization, the Counterclaim Suppliers' wholesale DME price/cost information.  Allstate

has no authorization and/or legal basis to obtain such information for fee schedule DME

bills.

52. Although Allstate has not yet obtained/appropriated such information from the Counterclaim

Suppliers, its attempt and conspiracy to obtain this information has caused the Counterclaim

Suppliers to incur significant legal fees to defend itself, including the cost of prosecuting this

counterclaim.

53. The Scheme relates to products used in interstate commerce because it impacts the suppliers'

businesses resulting in fewer transactions with out-of-state companies that sell supplies to

their medical practices.

54. Accordingly, the Scheme violates 18 U.S.C. §1832, an act of racketeering pursuant to 18

U.S.C. §1961.

## COUNT I: Allstate Has Committed A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. §1962(d)

55. By entering into the agreement to execute the Scheme, the Allstate entities, each "persons" pursuant to 18 U.S.C. §1961(3), have formed a conspiracy to commit an ongoing pattern of attempted extortion and attempted theft of trade secret against the Counterclaim Suppliers since 2015.

56. 18 U.S.C. §1951 and 18 U.S.C. §1832 are made acts of racketeering by 18 U.S.C. §1961(1)(B).

57. This agreement violates 18 U.S.C. §1962(c).   Thus, each Allstate entity has violated 18 U.S.C. §1962(d).

58. This is a pattern of racketeering activity, pursuant to 18 U.S.C. §1961(5), as it has been ongoing continuously since 2015 and will continue unabated.   To this day, over $300,000 remains unpaid to the Counterclaim Suppliers, as part of the overall Scheme.  To this day, Allstate continues attempting to extort the Counterclaim Suppliers and attempting to obtain the Counterclaim Suppliers' trade secrets without authorization.

59. The Scheme affects interstate commerce because it negatively impacts the suppliers' businesses resulting in fewer transactions with out-of-state companies that sell supplies to their medical practices.

60. The Counterclaim Suppliers are not the only victims of this Scheme.   Dozens of other suppliers were sued as part of the underlying RICO case.  Nearly all of the medical suppliers in the underlying RICO complaint were forced to ultimately capitulate to Allstate's demands.

## Demand for Judgment, Jury Trial, and Injunctive Relief On Count I

61. As a direct and proximate cause of the Allstate entities' RICO violations, the Counterclaim Suppliers have been injured by over $300,000, the amount of DME reimbursements that

14

Allstate has refused to pay.  Additionally, the Allstate entities' Scheme has caused the Counterclaim Suppliers to pay for attorneys to prosecute this case.  The amount of these damages will be proven at trial.

62. Accordingly, the Counterclaim Suppliers have been damaged in their business or property and assert RICO claims against each Allstate entity pursuant to 18 U.S.C. §1964(c).

63. It's time that the Suppliers stand up to Allstate's scheme with their own RICO suit.  As the Supreme Court recently noted, "After all, in the law, what is sauce for the goose is normally sauce for the gander."  *Haffernan v. City of Patterson, N.J.*, 136 S.Ct. 1412, 1418 (2016).  With this lawsuit, the Counterclaim Suppliers seek not only their attorney's fees and unpaid bills, but an injunction against Allstate from further pursuing any wholesale DME information and precluding the Allstate entities from alleging that the Counterclaim Suppliers' failure to provide such information is billing fraud.

64. WHEREFORE, the Counterclaim Suppliers demand judgment be entered in their favor and against each of the Allstate entities pursuant to 18 U.S.C. §1964(c) for treble the amount of their damages as proven at trial, the costs of this suit, reasonable attorney's fees, interest, and any other relief deemed just.  The Counterclaim Suppliers also seek preliminary and permanent injunctions, pursuant to 18 U.S.C. §1964(a), precluding the Allstate entities from further pursuing any wholesale DME information and precluding the Allstate entities from alleging that the Counterclaim Suppliers' failure to provide such information is billing fraud.

65. The Counterclaim Suppliers also demand a trial by jury.

## COUNT II: Declaratory Judgment

66. The preceding paragraphs are incorporated herein as though fully set forth below.

67. There is an actual case in controversy between the Counterclaim Suppliers and the Defendants regarding more than $300,000 in unpaid bills submitted by the Counterclaim Suppliers for reimbursement.

68. This amount is increasing each month as the Counterclaim Suppliers continue to submit new bills to the Defendants for reimbursement, pursuant to the New York no fault insurance laws.

69. The Counterclaim Suppliers have a right to this reimbursement under New York no fault insurance laws.

70. Wherefore, the Counterclaim Suppliers request a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, declaring that the Suppliers have a right to reimbursement from the Defendants for this unpaid amount.

71. The Counterclaim Suppliers also demand a trial by jury.

Dated:  September 9, 2016

Respectfully submitted,

/s/ Howard W. Foster

By:    Howard W. Foster
       Foster PC
       150 N. Wacker Drive, Suite 2150
       Chicago, IL  60606
       Telephone:  (312) 726-1600
       Email:  hfoster@fosterpc.com

16